SANDERLIN v. STATE.

Opinion delivered February 6, 1928.

1. HOMICIDE—ADMISSIBILITY OF DYING DECLARATIONS.—Where decedent stated, "You had better hurry up and get a doctor, I am dying," and where there was evidence that he was cut to pieces and that he died seven or eight hours after the wound was inflicted, the evidence was *held* sufficient to admit proof that he told witnesses that accused had cut him.

2. CRIMINAL LAW—INSTRUCTION AS TO DYING DECLARATIONS.—In a prosecution for murder, refusal of the court to instruct the jury at the request of accused, that, although the statement of deceased that accused had cut him was admissible as evidence, still it was a question for the jury to determine what weight they should give such testimony, and in determining this question they should take into consideration other statements made at a time when deceased had lost hope of recovery, *held* error.

3. HOMICIDE—ADMISSIBILITY AND WEIGHT OF DYING DECLARATIONS.—It is the province of the court to determine whether a declaration

of a decedent was made under circumstances to justify the court in letting it go to the jury, but its weight is to be determined by the jury.

4.   HOMICIDE—INSTRUCTION ON VOLUNTARY MANSLAUGHTER.—Evidence in a prosecution for murder by cutting, *held* not sufficient to warrant giving defendant's requested instruction on voluntary manslaughter.

. Appeal from Drew Circuit Court; *Turner Butler,* Judge; reversed.

*Patrick Henry,* for appellant.

. *H. W. Applegate,* Attorney General, and *John L. Carter,* Assistant, for appellee.

McHANEY, J.   Appellant was indicted, charged with murder in the first degree for the killing of one Harold Robin, by stabbing and cutting him, from which he died a few hours later.   On a trial he was convicted of murder in the second degree, and his punishment fixed by the jury at eighteen years in the penitentiary.   The facts are substantially as follows:

A party of young people who were boarding with Mrs. Green, in Monticello, went out to the Nelson home, about six miles west of Monticello, on the Wilmar road, to attend a dance, at invitation of Miss Ouida Nelson. A number of them went on a truck.   The deceased, with Gertrude and Willie Lassiter, went in a Ford sedan. Appellant, Ed Lane and Basil Boone also attended this dance, without invitation from Miss Nelson, in a Ford roadster.   After the dance was over, J. A. Stith, one of the parties on the truck, heard appellant cursing, thought he was referring to him, and they had a difficulty, in which Stith knocked appellant down, and about that time Boone stuck Stith with a knife.   The parties on the truck started for home, and, when they had got a short distance down the road, appellant, Lane and Boone passed them in the roadster, and said something about getting them before they got to town.   Up until that time the deceased had had no difficulty with appellant or any of the others.   As they drove on toward town the truck overtook the sedan in which Robin was riding with the two

young ladies, who had stopped to repair a tire, or to change tires. The boys on the truck assisted Robin in repairing his tire, and, when he had started up, switched on his lights, they saw the Ford roadster stopped in the middle of the road, something like 40 or 50 feet ahead, on a culvert or narrow wooden bridge. According to the State's testimony, when Robin drove up to the roadster, Lane was out of the car, and drew a shotgun on Robin, and Stith says he jumped off the truck and asked Lane not to have any trouble, and that Lane drew the gun on him, which he grabbed, and a scuffle ensued over the gun. While they were tussling over the gun, Stith says Sanderlin ran around the car and stuck a knife in his arm, and that he turned the gun loose and ran something like 25 or 30 yards, crawled through the fence, and got behind a log, where he remained six or seven hours, until after daylight the next morning. He did not see appellant stab Robin.

Jack Fultz testified that, after Stith ran off, deceased was standing to his left, and that Lane and Boone were in front of him, and that it looked to him like appellant ran against Robin, who stepped back two or three steps, dropped to his knees, and that he asked Robin what was the matter with him, and he said "He cut me." Fultz then put Robin in his car, and Handley brought him to town.

Witnesses were permitted to testify, over appellant's objection, to statements made by deceased, in the nature of dying declarations, that Sanderlin had cut him, and it is urged that these statements were not made under a sense of impending death, and therefore inadmissible. We have examined the evidence very carefully on this assignment of error, and find that there was sufficient evidence to sustain the court in overruling appellant's objection on the ground that the declarations were not made at a time when the deceased thought death was impending. Taking into consideration his expression, "If you don't hurry up and get a doctor here, I am dying," "You had better hurry up and get a doctor, I am

dying," and other testimony to the effect that he said he was dying, and was cut all to pieces, together with the nature of the wound, which was a cut in the abdomen, from which his intestines protruded, and the fact that he died some seven or eight hours after the wound was inflicted, we think the court did not err in permitting the witnesses to say that deceased told them that Sanderlin had cut him.

The most serious assignment of error, however, and the one we think calls for a reversal of this case, is the refusal of the court to instruct the jury, on appellant's request, that, although the statements of the deceased, that appellant had cut him, had been admitted in evidence, still it was a question for the jury to determine what weight they should give such testimony, and, in determining this question, they should take into consideration whether the statements were made at a time when deceased had lost all hope of recovery. In *Alford* v. *State,* 161 Ark. 256, 255 S. W. 884, this court said:

"Dying declarations are admitted in evidence by the court upon a *prima facie* showing that they were made *in extremis,* but, notwithstanding their admission in evidence, it is still within the province of the jury trying the case to decide, from the whole evidence and all reasonable inferences therefrom, whether utterances were made under consciousness of impending death. It is error to take this question from the jury."

And in the more recent case of *Sullivan* v. *State,* 163 Ark. 11, 258 S. W. 643, this court said:

"Under this testimony and the instructions relating to it the jury might have found that Hay had not despaired of hope of recovery; but we do not think this finding was the only one warranted by the testimony. There was a question for the jury, and the testimony was submitted to the jury under proper instructions."

The instructions referred to in this case were not set out by the court, but, on an examination of the instructions given, we find that the exact question now under consideration was submitted by the trial court to

the jury, and they were told therein that, before they could give any consideration to the statement of the deceased as his dying declaration, "it must be shown by the evidence that he was at the time fatally wounded, and made the declaration under apprehension of impending death without expectation or hope of recovery." And they were further told that they must first decide whether the statements made as dying declarations were made under an apprehension of impending death. The instructions given in the Sullivan case are too lengthy to set out in full, but they received the approbation of this court in that case.

The rule therefore with reference to the admissibility of dying declarations is that, in the first instance, it is the duty of the court, on the showing made, to determine whether the declaration was made under such circumstances as to justify the court in letting them go to the jury under proper instructions as to the weight to be given them, and in this respect the court seems to have adopted the same rule applicable to the admissibility of confessions. That is, that the court, in determining the admissibility of a confession, first determines the preliminary question as to whether it was freely and voluntarily made, and, having admitted it, the jury should be instructed that, in determining what weight they should give to the confession, they should first determine whether the confession was made freely and voluntarily. As was said in the case of *Spurgeon v. State,* 160 Ark. 112, 254 S. W. 376:

"Now, the court refused to exclude this confession from the jury, but submitted it to the jury upon instructions as favorable as the defendant could ask for, and left it to the jury to determine whether or not the confession was free and voluntary."

We are therefore of the opinion that the court erred in refusing to submit this question to the jury, as requested in instructions G and H, or some similar instructions which have heretofore met with the approval of this court.

Other questions are raised in brief of counsel for appellant, including the refusal of the court to instruct the jury on voluntary manslaughter. We will not enter upon an extended discussion of this assignment, or any others, as they may not arise on another trial. Suffice it to say that we do not think there was sufficient testimony in this record on which to base instruction on voluntary manslaughter. For the error indicated the judgment will be reversed, and the cause remanded for a new trial.